**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. _____**

CENTER FOR BIOLOGICAL DIVERSITY, a
501(c)(3) nonprofit organization,

        Plaintiff,

    vs.

KEVIN GUTHRIE, in his official capacity as
Executive Director of the Florida Division of
Emergency Management,

        Defendant.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Plaintiff Center for Biological Diversity ("the Center") files this Complaint against

Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of

Emergency Management, ("the Division") and states the following:

### INTRODUCTION

1. When Mr. Guthrie spoke at the opening of the mass immigrant detention facility

Mr. Guthrie calls "Alligator Alcatraz," he claimed that "Florida is and always will be a law-and-

order state." Despite this claim, the Division is currently responsible for significant, repeated,

and ongoing violations of the Clean Air Act, 42 U.S.C. §§ 7401–7675, at this facility.

2. Designed to confine several thousand detainees, the active detention and

deportation facility ("Everglades Detention Center" or "Facility") is located at the Dade-Collier

Training and Transition Airport ("TNT Site"), a limited-use airport surrounded by Big Cypress National Preserve.

3. The Division operates the Everglades Detention Center through an agreement with the U.S. Department of Homeland Security and U.S. Immigration and Customs Enforcement.

4. Rather than abide by applicable law, the Division proceeded to construct and operate the Everglades Detention Center without obtaining the mandatory air pollution permit for a variety of air-polluting equipment and activities at the Facility.

5. The Everglades Detention Center depends upon a fleet of large diesel-burning generator sets for electrical power, diesel-burning lighting towers, and other air-polluting equipment and activities.

6. This air-polluting equipment at the Facility emits significant amounts of dangerous air pollutants that are harmful to human health and the environment, including pollutants that cause cancer, asthma attacks, cardiovascular disease, and premature death.

7. Congress specified in the Clean Air Act that new "major" sources of air pollution must obtain a major source air pollution permit before they commence construction. *See* 42 U.S.C. § 7475(a)(1).

8. This permit obligates would-be polluters to conduct detailed air quality analyses prior to commencing construction, solicit public participation, and implement the best available pollution controls, among other requirements, to keep air pollution in check and to protect public health and the environment. *Id.* §§ 7475(a)(2)–(7), 7470.

2

9. The Everglades Detention Center is a major source of air pollution requiring one of these permits under the Clean Air Act's Prevention of Significant Deterioration ("PSD") permitting program.

10. Even the Division's own assessment of the Everglades Detention Center's air pollution concluded that the massive emissions "generated by . . . continuously running the 200+ generators that provide power to the facility" mean the Facility is "considered a major source pursuant to Prevention of Significant Deterioration regulations."

11. Yet, on or about June 24, 2025, the Division began constructing and operating a fleet of diesel-burning generator sets, diesel-burning lighting towers, and other air-polluting equipment at the Everglades Detention Center without any air permits, to the detriment of human health and the environment.

12. As of the date of this Complaint, the Division has not obtained any air permits for the Everglades Detention Center.

13. The Center seeks declaratory and injunctive relief, ordering the Division to cease operating the air-polluting equipment at the Everglades Detention Center unless and until it obtains the required PSD air pollution permit; and to pay appropriate civil penalties for each day of violation. This permit will reduce harmful emissions, and the permitting process will yield important information to which members of the public are entitled.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over the Clean Air Act claims set forth in this Complaint against Defendant pursuant to 42 U.S.C. § 7604(a) (Clean Air Act "citizen suit" provision) and 28 U.S.C. § 1331 (federal question jurisdiction).

15.     This Court is authorized to award the requested declaratory and injunctive relief and apply any appropriate civil penalties. 42 U.S.C. § 7604; 28 U.S.C. §§ 2201–2202.

16.     Venue is proper in the Southern District of Florida because a substantial part of the events or omissions giving rise to the claims herein occurred in this district. 28 U.S.C. § 1391(b)(2). This includes but is not limited to:

17.     The Division initiated the creation of the Everglades Detention Center when Defendant Guthrie transmitted a notice of intent to purchase the TNT Site and associated lands to Miami-Dade Mayor Daniella Levine Cava, because Miami-Dade County owns the TNT Site. Mayor Cava did not immediately accept but rather expressed concerns and a need for additional information, including information about environmental impacts, via a June 23, 2025 letter to Defendant Guthrie. In response, the Division commandeered the TNT Site and associated lands from Miami-Dade County through another letter from Defendant Guthrie to Mayor Cava on the same date.

18.     The Clean Air Act requires public participation and a public hearing opportunity for interested persons before a PSD permit may be issued. 42 U.S.C. § 7470(5) (Congress's declaration of purpose for the PSD program, "that any decision to permit increased air pollution in any area . . . is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process"); *see id.* § 7475(a)(2). The Division failed to provide public notice of any PSD permit application or draft permit. Notice and participation opportunities for the public in Miami-Dade County are required, as it is a county where the activity would take place and the effects of any permitting action would occur.

19.     Local pollution control agencies, city and county governments, and Indian Governing Bodies in this district also were not notified, including the Miccosukee Tribe of Indians of Florida, whose members' residences are primarily located in the Miccosukee Reserved Area a few miles southeast of the TNT Site in Miami-Dade County, and whose administration building is located in Miami-Dade County.

20.     The public in Miami-Dade County also was not provided access to the required information about the Facility as part of a public participation opportunity, including detailed information about the Facility as a source of air pollution, the Division's analyses of the Facility's impacts to air pollution, planned pollution controls, or the Florida Department of Environmental Protection's ("Department") air quality analyses and preliminary determination about whether the permit should be approved or denied.

21.     The public did not have the required opportunity for public inspection of this information at the local Department district office in the affected districts, including the Southeast District Branch Office located in Monroe County, which is in the Southern District.

22.     The public, including in Miami-Dade County, also was not afforded the required notice or the opportunity to provide oral testimony or otherwise participate in a public hearing on the State's proposed action on a PSD permit application.

23.     The Division also failed to undertake any air quality analyses required by the Clean Air Act. 42 U.S.C. § 7475(a)(3)–(7). The Division, for example, did not determine whether the Facility will cause or contribute to exceedances of the National Ambient Air Quality Standards or increments in the Southern District. Typically, these analyses must assess air quality impacts of the source within a minimum radius of 50 kilometers from the source of air pollution. A 50-kilometer radius from the Everglades Detention Center extends significantly into

Miami-Dade County. This radius is extended even further where a National Park is within the vicinity of the source, as Everglades National Park is here.

24. Where emissions from a major source may affect specially protected "Class I" areas of the country, including Everglades National Park, which is approximately seven miles southeast of the Facility, the Clean Air Act requires that the Federal Land Manager and Federal official charged with direct responsibility for managing the lands of the Class I area receive a copy of the permit application and notice of every action related to the consideration of the permit. 42 U.S.C. § 7475(a)(5), (d). These officials have an affirmative responsibility to protect the Air Quality Related Values of the Class I area, like visibility and preventing air pollution deposition in Everglades National Park, and a major source permit may not be issued for a source with adverse impacts on a Class I area. *Id*. The portion of Everglades National Park nearest to the Facility is located in Miami-Dade County in the Southern District. The Federal official charged with responsibility over Everglades National Park is headquartered in Miami-Dade County. This official has not received a permit application or notice of permitting actions for the Everglades Detention Center, neither of which exists, and has not had the opportunity to discharge their affirmative responsibility to protect the Air Quality Related Values of Everglades National Park. Nor has the public in Miami-Dade or Broward Counties in the Southern District of Florida had the opportunity to participate in the requisite public participation process for Class I areas.

25. Nor did the Division determine what air quality monitoring in Miami-Dade County is required to determine the Facility's ongoing effects on air quality.

26. Further, decisions related to the setup of the Everglades Detention Center and its ongoing operations took place, and continue to take place, at the Miami field office of U.S.

Immigration and Customs Enforcement, which coordinates and works with the Division regarding the Facility's operations, including the Facility's compliance with ICE standards.

27.     The Facility's air pollution has significant adverse effects on Miami-Dade County, including for the people who spend time there, as the Centers' members do, and for its ecosystem, including wildlife, like the Florida bonneted bat, the Florida panther, and Everglade snail kite. This pollution disperses within the County, doing harm directly through inhalation and by settling on the land, waters, and plants via deposition, among other pathways. These harms have both short- and long-term consequences for the county. The Division has not analyzed these harms, nor mitigated or prevented them, in contravention of the Clean Air Act.

28.     A substantial part of the property, that is, the Everglades Detention Center, is located in this judicial district. 28 U.S.C. § 1391(b)(2).

29.     Alternatively, the Facility, as a stationary source of air pollution, is located in the Southern District of Florida. *See* 42 U.S.C. § 7604(c)(1).


## PARTIES

### Plaintiff

30.     Plaintiff Center for Biological Diversity has members who work, recreate, and spend time, for various purposes, near the Everglades Detention Center, and who are harmed by illegal air pollution from the Facility.

31.     The Center is a national, non-profit conservation organization. The Center has offices throughout the United States, including in Florida, and more than 93,000 active members across the country. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through

science, policy, and environmental law. Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for all people.

32.     The Center's members and staff derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from visiting Big Cypress National Preserve and Everglades National Park, including the areas near the Everglades Detention Center and the areas impacted by the Facility's air pollution, and from observing the ecosystems and species who live there. They will continue to do so. The Center's members live near or regularly visit Big Cypress National Preserve and the Greater Everglades Ecosystem and have plans to return.

33.     For example, Center member Conny Randolph lives about seven miles from the Everglades Detention Center. Ms. Randolph and her husband hike in the area of the Facility, with definite intent to continue so doing, and are avid photographers of the plants, wildlife, pollinators, and landscapes in the proximity of the Facility. Ms. Randolph and her husband sell their photographs as part of their own business.

34.     Prior to the construction of the Facility, Ms. Randolph and her husband regularly hiked around the TNT Site, including visiting the off-road vehicle road that splits off from the TNT Site's Jet Port road—as frequently as three times a month in the summertime. Since construction began, they have tried to avoid the trails near the Facility in part because air pollution threatens their health, especially because Mr. Randolph has asthma. Ms. Randolph is aware that the U.S. Environmental Protection Agency has found that people with asthma are particularly susceptible to harm from the air pollutants emitted and created by the Facility.

Further, Ms. Randolph has had a long recovery from a respiratory disease she contracted in April 2026. The Randolphs must still drive past the Facility on U.S. 41 frequently, at least twice a month, as there is no other way to access the eastern Everglades without major inconvenience. Ms. Randolph and her husband typically enjoy driving through the area with their windows rolled down, but they now roll them up more often than not when passing the entrance to the Everglades Detention Center to avoid being exposed to air pollution. Ms. Randolph is also deeply concerned about the lack of information about the Facility's impairment of air quality and the environment.

35.     The Facility's air pollution has interfered with Ms. Randolph's ability to photograph parts of the Big Cypress ecosystem she loves, as well as the plants, wildlife, and pollinators that she formerly photographed regularly. This interferes with Ms. Randolph's recreational, aesthetic, and artistic pursuits, as well as her business. The light pollution from the Facility also interferes with these interests. Even from as far as 25 or 30 miles away, the light pollution from lights powered by diesel-burning engines at the Everglades Detention Center washes out the night sky, comets, and wildfire glow that Ms. Randolph enjoys photographing regularly, as often as three times a month in the summer. This hurts her interests, including her business.

36.     Ms. Randolph and her husband also visit Everglades National Park, typically between four and eight times a year, to hike and take photographs. They have definite plans to return. Impaired air quality, including impaired visibility, interferes with their health, and recreational and aesthetic interests, in the National Park, as well as their photography, and therefore their business.

9

37.     Ms. Randolph has a deep connection and love of the biodiversity in and around the Facility, including Florida panther, a variety of wildflowers, and several bird and butterfly species. Ms. Randolph is deeply concerned about air pollution harming these species, both directly and through deposition on soils and waterbodies. Since the Facility arose, Ms. Randolph has noticed a significant decline in several species that she formerly observed and photographed regularly and in larger numbers. Air pollution from the Everglades Detention Center threatens these species, several of which are especially vulnerable and protected by the Endangered Species Act, and by putting downward pressure on their populations decreases the likelihood that Ms. Randolph will encounter them and be able to photograph them.

38.     Another Center member, Christina Celano, is a professional wildlife photographer living in the Florida panhandle. Ms. Celano has been visiting the TNT Site, and the area surrounding the TNT Site, since she was six years old. For years, she has driven past the Facility site one or more times per year to visit friends in south Florida, a habit she intends to maintain. During these drives, Ms. Celano keeps an eye out for wildlife and has in the past frequently stopped at or around the TNT Site and exited her car to photograph alligators, birds, and other animals due to what used to be a noteworthy abundance of wildlife in the TNT Site area.

39.     However, the Facility's air pollution has significantly interfered with Ms. Celano's ability to photograph wildlife in the ecosystem surrounding the Facility. Since construction of the Facility began, Ms. Celano has noticed a marked decrease in wildlife photography opportunities when driving past the Facility. Where in the past she would normally notice dozens of birds, reptiles, or other animals to photograph at the site, she now notices no or few animals when passing by. Ms. Celano is deeply concerned that the operation of generators at the Facility and the resultant air, noise, and light pollution is responsible for the decrease in

10

wildlife at the Facility and the resultant injury to her recreational, aesthetic, and professional interests in wildlife viewing and photography there. Ms. Celano is also concerned about the lack of information about the harm the Facility's air pollution is doing to air quality, species, and the environment.

40. Ms. Celano also routinely visits Everglades National Park to take wildlife photographs and has definite plans to return. One of the sites in the National Park that she regularly visits, Shark Valley, is located less than ten miles from the fenceline of the Facility. Impaired air quality, including impaired visibility, interferes with her recreational, aesthetic, and professional interest in the National Park.

41. The Center has long fought to protect air quality and to protect the health and well-being of the wildlife, plants, and ecosystems of Big Cypress National Preserve and the Everglades, as well as the people who spend time there and have interests in them.

42. The Center is a corporation. Thus, the Center is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

43. The Center's members are being injured by Defendant's unlawful actions, which harm and threaten their health, the integrity of Big Cypress National Preserve and related ecosystems, the wellbeing of the wildlife and plants living there, and thus the Center's and its member's interests in them.

44. The injuries described are actual, concrete injuries presently suffered by the Center and its members, and they will continue to occur unless this Court grants immediate relief. The relief sought herein would redress those harms. The Center has no other adequate remedy at law.

45.     Neither the claims asserted nor the relief requested requires the participation of individual members of the Center in this action.

46.     The Center and its members further suffer from an informational injury due to the lack of air quality analyses required for a PSD air pollution permit. 42 U.S.C. § 7475(a)(2)–(7).

47.     The Center and its members also suffer from a procedural injury because they have been deprived of the public hearing and public comment opportunities required for a PSD air pollution permit. *Id*. §§ 7470(5), 7475(a)(2). The Center has extensive experience and expertise in commenting on PSD permits. Comments from the public, including the Center's members, could reduce or mitigate the harms from the Facility's air pollution. The Center's members also find it cathartic and valuable to give oral testimony on PSD permits at the public hearing the Clean Air Act requires. *Id*.

**Defendant**

48.     Defendant Kevin Guthrie is the Executive Director of the Florida Division of Emergency Management. He is an individual. Thus, Mr. Guthrie is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

49.     The Executive Director's Office of the Division provides for the management and oversight of all Division functions.

50.     The Division constructs and operates the Everglades Detention Center.

12

## LEGAL REQUIREMENTS

### The Clean Air Act

51.     The Clean Air Act is a broad remedial statute that Congress enacted to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(1).

52.     A "primary goal" of the Clean Air Act is "pollution prevention." 42 U.S.C. § 7401(c).

53.     The Clean Air Act requires the U.S. Environmental Protection Agency ("EPA") to regulate emissions of air pollutants that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §§ 7408, 7409.

54.     Certain of these air pollutants are called "criteria pollutants" and include carbon monoxide, nitrogen oxides ("NOx"), fine particulate matter, and ozone. 40 C.F.R. §§ 50.1–50.21.

55.     EPA sets National Ambient Air Quality Standards ("NAAQS") to limit concentrations of criteria pollutants in the ambient air across the nation to levels "requisite to protect the public health" and "requisite to protect the public welfare." 42 U.S.C. § 7409(b)(1), (b)(2). However, individuals and ecosystems can suffer adverse effects from exposure to pollution levels below the NAAQS. *See, e.g.*, *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1157–58 (D.C. Cir. 2020).

56.     Each state must develop a State Implementation Plan ("SIP") with provisions, including a permitting program, meant to assure the NAAQS are achieved and maintained within the state. 42 U.S.C. § 7410(a); 40 C.F.R. Pt. 51.

57.     SIPs must be submitted to and approved by EPA. 42 U.S.C. §§ 7407(a); 7410(a), (k).

**Prevention of Significant Deterioration Permitting**

58.     The Clean Air Act includes permitting requirements for stationary sources of air pollutants.

59.     Congress amended the Clean Air Act in 1977 to include a permitting program for sources of air pollution in areas of the country that are attaining the NAAQS, called the Prevention of Significant Deterioration ("PSD") program. 42 U.S.C. §§ 7470–7492.

60.     The Everglades Detention Center is located in an area that is designated as attaining the NAAQS. Thus, the PSD program is the permitting program that applies to the Facility.

61.     The central premise of the PSD program is that no person can construct, or even so much as propose to construct, a major stationary source of air pollution without first getting a PSD permit informed by air quality analyses and public participation, and which requires the use of the best available pollution controls. 42 U.S.C. §§ 7475(a), 7604(a)(3).

62.     The fundamental purposes of the PSD program are to "protect public health and welfare" and to assure that any increase in air pollution, and a state's decision to permit that pollution and increase, "is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process." 42 U.S.C. § 7470(1), (3), (5).

63.     Florida has adopted, and EPA has approved, PSD permitting requirements for stationary sources of air pollution into its SIP. 40 C.F.R. § 52.520(c); *see* Rules 62-210.300, 62-212.400, Florida Administrative Code ("F.A.C.").

64.     Florida's SIP sets forth the requirements for PSD permits that apply in the State of Florida, Rule 62-212.400, F.A.C., including by incorporating by reference provisions of the federal PSD regulations set forth at 40 C.F.R. § 52.21. Rule 62-204.800(3), F.A.C. (adopting and

14

incorporating the PSD regulations, 40 C.F.R. Pt. 52, Subpt. A, revised as of July 1, 2021, and 40 C.F.R. Pt. 52, Subpt. K, revised as of July 1, 2023).

65.     Under the Clean Air Act, the PSD program prohibits the construction of a "major emitting facility" unless "a permit has been issued for such proposed facility." 42 U.S.C. § 7475(a)(1).

> a.     Commencing construction of a facility means that the owner or operator of the stationary source has all necessary preconstruction approvals or permits and either has (1) begun, or caused to begin, a continuous program of actual on-site construction of the source; or (2) entered into binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of actual construction. Rule 62-210.200(67), F.A.C.
>
> b.     The "owner or operator" of a source is "[a]ny person or entity who or which owns, leases, operates, controls or supervises an emissions unit or facility." Rule 62-210.200(190), F.A.C.; *see also* 40 C.F.R. § 51.100(f).

66.     A "major emitting facility," synonymously referred to as a "major stationary source," is any source of air pollution "with the potential to emit two hundred and fifty tons per year or more of any air pollutant." 42 U.S.C. § 7479(1); *see also* 42 U.S.C. § 7602(j).

67.     The "potential to emit" of a source is "the maximum capacity of an emission unit or facility to emit a pollutant under its physical and operational design." Rule 62-210.200(203), F.A.C.

68.     The Florida SIP also defines a "major stationary source" as one that "has the potential to emit, 250 tons per year of a PSD pollutant." Rule 62-210.300(156)(a)(2), F.A.C.

69. The Florida SIP defines "PSD Pollutant" as "[a]ny 'Regulated NSR Pollutant' as defined at 40 CFR 52.21(b)(50) and as adopted and incorporated by reference in Rule 62-204.800, F.A.C." Rule 62-210.200(212)(b), F.A.C.; *see also* Rule 62-204.800(3), F.A.C.

70. The term "regulated NSR pollutant" includes, among other things, any pollutant for which a NAAQS has been promulgated. 40 C.F.R. § 52.21(b)(50)(i).

71. Carbon monoxide is a regulated NSR pollutant and PSD pollutant.

72. EPA has established a NAAQS for carbon monoxide. 40 C.F.R. § 50.8.

73. NOx is a regulated NSR pollutant and PSD pollutant.

74. EPA has established a NAAQS for NOx. 40 C.F.R. § 50.11.

75. NOx is a key precursor for ozone. 40 C.F.R. § 52.21(b)(50)(i)(B)(1).

76. EPA has established NAAQS for ozone. 40 C.F.R. §§ 50.9, 50.10, 50.15.

77. NOx is also a key precursor to fine particulate matter, which is particulate matter 2.5 microns or less in diameter. 40 C.F.R. § 52.21(b)(50)(i)(B)(3).

78. EPA has established a NAAQS for fine particulate matter. 40 C.F.R. §§ 50.18, 50.20, 50.23.

### Stationary Sources of Air Pollution

79. PSD permitting requirements apply to "stationary sources" of air pollution under the Clean Air Act. 42 U.S.C. §§ 7475(a), 7479(1).

80. Pursuant to the Florida SIP, for purposes of defining a "major stationary source," a "stationary source" is "all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under

the control of the same person or persons under common control, except the activities of any vessel; which emit or may emit a PSD pollutant." Rule 62-210.200(156)(d), F.A.C.

81.     Stationary sources are comprised of "emissions units." An emissions unit is "any part or activity of a facility that emits or has the potential to emit any air pollutant." Rule 62-210.200(99), F.A.C.

82.     Sources that are subject to New Source Performance Standards ("NSPS") under Section 111 of the Clean Air Act, 42 U.S.C. § 7411, are stationary sources. 42 U.S.C. § 7550(10); 40 C.F.R. § 1068.30.

83.     NSPS are federally enforceable, technology-based emission standards that apply to stationary sources to control their air pollution. These standards set the floor for emissions controls on certain types of sources.

84.     Relevant here, combustion-ignition (i.e., diesel-burning) internal combustion engines that were manufactured after 2006, and are ordered by the owners or operators of the engines after 2005, are subject to an NSPS under Section 111 of the Clean Air Act. *See* 40 C.F.R. Pt. 60, Subpt. IIII ("NSPS IIII").

85.     Florida has adopted NSPS IIII into its SIP. Rule 62-204.800(8)(b)(91), F.A.C.

86.     NSPS IIII defines "stationary internal combustion engine," in relevant part, to mean "any internal combustion engine, except combustion turbines, that converts heat energy into mechanical work and is not mobile." 40 C.F.R. § 60.4219.

87.     NSPS IIII goes on to define "stationary internal combustion engine" by stating: "Stationary [internal combustion engines] differ from mobile [internal combustion engines] in that a stationary internal combustion engine is not a nonroad engine as defined at 40 CFR

17

1068.30 (excluding paragraph (2)(ii) of that definition), and is not used to propel a motor vehicle, aircraft, or a vehicle used solely for competition." *Id*.

88.     NSPS concludes the definition of "stationary internal combustion engine" by stating: "Stationary [internal combustion engines] include reciprocating [internal combustion engines], rotary [internal combustion engines], and other [internal combustion engines], except combustion turbines." *Id*.

89.     An internal combustion engine that remains or will remain at a location for more than 12 consecutive months, or a shorter period for seasonal sources, does not qualify as a "nonroad engine" that is excluded from either the definition of a "stationary source" or NSPS IIII's definition of a "stationary internal combustion engine." 40 C.F.R. § 1068.30 ("Nonroad engine" definition at (2)(iii)); *see also* 42 U.S.C. §§ 7602(z), 7550(10); 40 C.F.R. §§ 60.4200(e), 60.4219, 1068.31(e)(1).

90.     At the time the Division proposed to construct the Facility, Defendant intended that the internal combustion engines used to power the generator sets, lighting towers, and any additional air-polluting equipment at the Facility would remain for more than 12 months. At the time the Division commenced construction at the Facility, Defendant intended for these internal combustion engines to remain at the Facility for more than 12 months. These internal combustion engines used at the Facility will remain at the Facility for more than 12 months. Thus, these emission units are not nonroad engines. 40 C.F.R. § 1068.30 ("Nonroad Engines" at (2)(iii)).

**PSD Permitting Requirements**

91.      As part of PSD permitting of stationary sources, the Clean Air Act requires detailed air quality analyses; strict pollution control standards; and heightened protections for air quality in special areas like National Parks. 42 U.S.C. § 7475(a).

*Air Quality Analyses*

92.      No PSD permit may be issued for a major stationary source unless the owner or operator of the facility can demonstrate that its construction or operation will not cause or contribute to air pollution in excess of any NAAQS, as well as site-specific ambient air quality standards known as "increments." 42 U.S.C. § 7475(a)(3); Rule 62-212.400(5), F.A.C.

93.      As part of the requisite air quality analysis, the owner or operator's application for a PSD permit must contain an analysis of ambient air quality in the area that the source would affect for each pollutant the source has the potential to emit in a "significant" amount. Rule 62-212.400(7), F.A.C. (referencing 40 C.F.R. § 52.21(m)).

94.      For purposes of PSD permitting, "significant" means, in relevant part, the source has the potential to emit the following pollutants in amounts equal to or greater than the following emissions rates:

      a.      100 tons of carbon monoxide per year;

      b.      40 tons of NOx per year;

      c.      40 tons of sulfur dioxide per year;

      d.      25 tons of particulate matter per year;

      e.      15 tons of particulate matter 10 microns or less in diameter;

      f.      For ozone: 40 tons of NOx or volatile organic compounds per year;

19

g.    For fine particulate matter: 10 tons of direct fine particulate matter per year, or 40 tons of NOx emissions. Rule 62-210.200(236)(a), F.A.C.

h.    For the pollutants listed above, "significant" also means <u>any</u> emissions rate associated with a major stationary source that constructs within 10 kilometers of a Class I area, *see infra* ¶ 104, where there is an impact on such area equal to or greater than 1 $\mu g/m^3$ (24-hour average). Rule 62-210.200(236)(b), F.A.C.

95.    The air quality analysis also must include any post-construction air quality monitoring necessary to determine the effects the source's air pollution is having, or may have, on the area. Rule 62-212.400(7), F.A.C. (referencing 40 C.F.R. § 52.21(m)).

96.    Additional impact analyses of impacts to visibility, soils, and vegetation are required of owners or operators. Rule 62-212.400(8), F.A.C. (referencing 40 C.F.R. § 52.21(o)(3)).

97.    Information about applications for permits to construct a new major stationary source, and proposed state action on those applications, must be made available to the public for review, comment, and a public hearing opportunity. 42 U.S.C. §§ 7470(5), 7475(a)(2); Rules 62-212.400(11), 62-210.350, & 62-110.106, F.A.C; *see also* Rule 62-212.400(4), F.A.C.

98.    Local pollution control agencies, city and county governments, and Indian Governing Bodies affected must also be notified of PSD permit applications.

*Best Available Control Technology*

99.    PSD permits must also impose emission limits that reflect the maximum degree of pollution reduction achievable through the use of stringent pollution controls on an ongoing basis.

100.    This emission limit is known as the best available control technology, or "BACT." 42 U.S.C. §§ 7475(a)(4) (prohibiting construction of a major emitting facility unless it is subject to BACT, among other requirements), 7479(3); *see also* Rules 62-210.200(34); 62-212.400(4)(c), (10)(b), F.A.C.

101.    In addition to applying BACT to reduce emissions of the NSR pollutant(s) and PSD pollutant(s) that the source emits or has the potential to emit more than 250 tons per year of, PSD permits must also apply BACT for each regulated NSR pollutant and PSD pollutant that the source has the potential to emit in significant amounts. 42 U.S.C. § 7475(a)(4); *see also* Rule 62-212.400(10)(b), F.A.C.; *supra,* ¶ 94 (setting forth the definition of "significant" for purposes of PSD permitting, including BACT).

102.    The Clean Air Act defines BACT as "an emission limitation based on the maximum degree of reduction of each pollutant . . . which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility." 42 U.S.C. § 7479(3).

103.    An emission limitation "limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis" during the operation of a source. 42 U.S.C. § 7602(k).

*Class I Area Requirements*

104.    The Clean Air Act gives specific, enhanced air quality and visibility protections to certain areas of special national or regional natural, scenic, recreational, and/or historic value. These are called Class I areas.

105.    Everglades National Park is a Class I area. *See* 40 C.F.R. § 81.407 (identifying Everglades National Park as a mandatory Class I federal area where visibility is an important value); Rule 62-210.200(54)(a), F.A.C.; *see also* 42 U.S.C. § 7472(a).

106.    Additional PSD permitting requirements apply for a proposed major stationary source with emissions that may affect a Class I area.

107.    Because every area of Florida is within 250 kilometers of at least one Class I area, all PSD applications are required to include Class I air quality impact analyses under guidance issued by the Florida Department of Environmental Protection ("the Department"), Florida's air permitting authority.[1]

108.    EPA also requires Class I air quality impact analyses for sources that are located within 100 kilometers of a Class I area, at a minimum.[2]

109.    The State of Florida is required to provide a copy of any permit application, and notice of any permit actions, to the EPA Administrator for a proposed major stationary source that may affect a Class I area. 42 U.S.C. § 7475(a)(5), (d).

---

[1] *See* Florida Department of Environmental Protection, *Class I Areas Map* (accessed May 8, 2026), https://floridadep.gov/air/air-business-planning/content/class-i-areas-map; *see also* Florida Department of Environmental Protection*, Prevention of Significant Deterioration (PSD) Air Quality Modeling Best Practices*, at 13 (accessed May 8, 2026), https://floridadep.gov/sites/default/files/PSD%20Air%20Quality%20Modeling%20Best%20Practices-2024.pdf.

[2] *See* Director John S. Seitz, EPA Office of Air Quality Planning and Standards, *Clarification of Prevention of Significant Deterioration (PSD) Guidance for Modeling Class I Area Impacts*, at 1 (Oct. 19, 1992) (memorandum), https://www.epa.gov/sites/default/files/2015-07/documents/class1.pdf. *See also* Rule 62-210.350(2)(h), F.A.C.

110.    The EPA Administrator must then provide notice of the permit application to the Federal land manager and the Federal official directly responsible for managing the lands within the area. 42 U.S.C. § 7475(d); Rule 62-212.400(9), F.A.C. (referencing 40 C.F.R. § 52.21(p)); *see also* 40 C.F.R. §§ 52.27, 51.307(a).

111.    The notice must include an analysis of the proposed impacts on visibility in the Class I area, as well as the Department's preliminary determination on the application, as informed by a public participation process. 42 U.S.C. § 7475(d); Rule 62-212.400(9), F.A.C. (referencing 40 C.F.R. § 52.21(p)); Rule 62-212.400(11), F.A.C.

112.    The Federal land manager and Federal official have an "affirmative responsibility" to ensure the protection of Air Quality Related Values, like visibility and preventing pollution deposition, for the Class I area. The Department cannot issue the PSD permit if the Federal officials demonstrate the source's emissions adversely impact these values. 42 U.S.C. § 7475(d); *see also* Rule 62-212.400(9), F.A.C. (referencing 40 C.F.R. § 52.21(p)).

113.    Everglades National Park experiences relatively poor air quality. Air pollution that settles on land, waters, and plants, including nitrogen pollution, is a specific problem of concern for the Federal officials charged with protecting this area. As a result, preserving ecosystem integrity by working to mitigate impacts of nitrogen deposition is a key Air Quality Related Value for Everglades National Park, as are visibility and vegetation health.

**<u>Citizen Suit Enforcement Provisions</u>**

114.    The Clean Air Act's "citizen suit" provision authorizes "any person" to commence a civil action against "any person who proposes to construct or constructs any new or

modified major emitting facility without a permit required under part C of title I (relating to significant deterioration of air quality)." 42 U.S.C. § 7604(a)(3).

115. This provision provides for public enforcement for a failure to obtain a PSD permit.

116. The Clean Air Act provides: "The term 'person' includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof." 42 U.S.C. § 7602(e); *see also* 42 U.S.C. § 7604(a). Plaintiff and Defendant each qualify as a "person."

*117.* An action under subsection (a)(3), for a claim of proposing to construct or constructing a major emitting facility without a PSD permit, may proceed immediately, without any prior notice. *See* 42 U.S.C. § 7604(b) (requiring notice for actions brought under subsections (a)(1) and (a)(2), but not (a)(3)); *see also Lecroy v. Wilbros, LLC,* No. 2:13-CV-00174-RWS, 2014 U.S. Dist. LEXIS 6920, at *9 (N.D. Ga. Jan. 21, 2014); *United States v. Am. Elec. Power Serv. Corp.*, 137 F.Supp.2d 1060, 1063–65 (S.D. Ohio 2001) (citing *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 963 F. Supp. 395, 406–07 (D. N.J. 1997)); *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 963–64 (7th Cir. 1994).

118. In a citizen suit, federal district courts may provide injunctive relief and/or apply appropriate civil penalties for each day of violation. 42 U.S.C. §§ 7604(a), 7413(b); 28 U.S.C. §§ 2201–2202.

119. Federal regulations provide that a penalty of $124,426 per day of violation may be imposed. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4 – Table 1.

## FACTUAL ALLEGATIONS

### The TNT Site

120.    The Everglades Detention Center is located at the Dade-Collier Training and Transition Airport property in Florida's Miami-Dade and Collier Counties, at 54575 East Tamiami Trail, Ochopee, Florida 34141.

121.    This TNT Site is located within Big Cypress National Preserve, and the Big Cypress Area as defined in Fla. Stat. § 380.055, as illustrated by Figure 1 below:



*Figure 1. GIS Map of the TNT Site Location (Curt Bradley/Center for Biological Diversity).*

122.    The Preserve was created "in order to assure the preservation, conservation and protection of the natural, scenic, hydrologic, floral and faunal and recreational values in the Big Cypress Watershed in the State of Florida and to provide for the enhancement and public enjoyment thereof." Pub. L. No. 93-440(a).

123.    The area of Big Cypress National Preserve where the TNT Site is located is known for its hiking trails, including off-road vehicle routes that serve as hiking trails as well.

124.    The area of Big Cypress National Preserve where the TNT Site is located is also known for its wetlands and critical wildlife habitat. The TNT Site is within an environmentally sensitive freshwater wetland ecosystem of ecological significance for wildlife habitat. The Site is important for drinking water supplies and Everglades water quality.

125.    Big Cypress National Preserve is home to a variety of species listed as threatened or endangered under the Endangered Species Act, including the Florida bonneted bat, the Florida panther, Everglade snail kite, and others, as documented on the Big Cypress National Preserve website.[3]

126.    Florida panthers have been documented on the TNT Site on many occasions.

127.    Florida bonneted bats have also been documented in the Big Cypress National Preserve, and their critical habitat overlaps with the TNT Site. 78 Fed. Reg. 61,004, 61,008, 61,011 (Oct. 2, 2013).

128.    Air pollutants, including those pollutants emitted by the Everglades Detention Center, can harm these species, both directly through exposure to airborne pollution and through deposition of the pollution on soils, plants, and water.

---

[3] National Park Service, *Big Cypress National Preserve, Florida: Animals* (accessed May 5, 2026), https://www.nps.gov/bicy/learn/nature/animals.htm.

129.   Exposing these threatened and endangered species to further environmental stress from air pollution can place downward pressure on their populations and reduce sightings.

130.   The TNT Site is also proximate to Everglades National Park, a Class I area, and part of the historic Everglades, as shown by Figure 1, above.

131.   The TNT Site, and the Everglades Detention Center as situated on the TNT Site, is approximately 12 kilometers from Everglades National Park, if not closer.

**Construction and Operation of the Everglades Detention Center**

132.   On or about June 19, 2025, Florida Attorney General James Uthmeier announced that the State of Florida, in partnership with the federal government, would open a mass immigrant detention center at the TNT Site, including via a video posted to his X (formerly Twitter) account and in an interview with Fox News.

133.   The U.S. Department of Homeland Security shared Mr. Uthmeier's announcement on June 19, 2025.

134.   The Division took control of the TNT Site on June 23, 2025.

135.   The Division commenced construction on the Everglades Detention Center on or about June 24, 2025.

136.   Initial construction occurred at a breakneck pace. On June 24, 2025, vehicle traffic traveling to and from the TNT Site increased significantly, with cars, buses, dump trucks, portable housing units, portable bathrooms, construction equipment, tanker trucks, and more regularly streaming in and out of the TNT Site.

27

137.    Trucks transported significant infrastructure and materials for development to the Site, including diesel-burning generator sets and diesel-burning lighting towers powered by their own built-in engines.

138.    The TNT Site was formerly a runway that was used infrequently—Mr. Uthmeier described the TNT Site as "virtually abandoned" when originally announcing the Everglades Detention Center, and Governor DeSantis described the TNT Site's "normal use" as "a very minimal use." The Division transformed it into a massive migrant detention center.

139.    Statements and available materials indicate that the mass detention center was designed to hold up to 3,000 detainees, supported by 1,000 workers and over 400 security personnel. The population of detained individuals has fluctuated over time.

140.    There were 655 detainees confined at the Everglades Detention Center on Tuesday, May 26, 2026, according to information U.S. Representative Maxwell Frost received during a visit to the Facility on the same date, as reported by *WPTV 5*.

141.    The Everglades Detention Center generally consists of tents, trailers, and a variety of equipment. The Facility's tents are used for confining and feeding detainees, and trailers are used for housing support staff. Food and sanitation facilities are also located in tents or trailers.

142.    The Facility operates continuously; 24 hours a day, seven days a week.

143.    At the time the Division proposed to construct the Facility, the Division intended to operate the Facility for more than 12 months. At the time the Division commenced construction at the Facility, Defendant intended to operate the Facility for more than 12 months.

144.    Upon information and belief, construction activities for the air-polluting equipment at the Everglades Detention Center are ongoing.

28

145.    For example, upon information and belief, two generators were brought to the Everglades Detention Center on the morning of April 23, 2026.

146.    Satellite and aerial imagery have captured ongoing construction of air-polluting equipment on numerous occasions over the past year.

147.    At all times relevant to this Complaint, Mr. Guthrie, in his official capacity as the Division's Executive Director, has been the operator of the Everglades Detention Center and continues to be the operator.

148.    Despite news reports that the Everglades Detention Center may cease operations and be deconstructed around this coming June, the Facility is currently operating; there has not been an official announcement regarding the Facility's closure; and there is no legal obligation for the Facility to close and deconstruct by a date certain.

149.    On or about May 15, 2026, in an interview with *Local 10 News*, Defendant Guthrie represented that Florida has not been given a timeline for any potential closure of the Facility, operations continue under existing agreements, and the current arrangement could last two years "or maybe even longer" depending on federal needs.

## Air Pollution from the Everglades Detention Center

150.    The TNT Site had no preexisting electrical utilities.

151.    The Florida Governor's Office stated that utilities for the Everglades Detention Center like water, sewage, and power are provided by equipment brought to the TNT Site.

152.    From the date construction commenced, the Division has constructed and operated a fleet of diesel-burning generator sets to produce electricity for the Everglades Detention Center.

29

153.    More than 25 industrial diesel-burning generator sets operate at the Everglades Detention Center to provide electricity.

154.    The Facility's electricity is not and will not be derived from an alternative source now or in the future.

155.    Among other equipment and activities requiring electricity, the generator sets provide electricity for a large number of industrial-size air conditioning units that run to cool the tents and structures forming the Everglades Detention Center; a staff village; administrative areas for staff; medical clinics; and likely sewage treatment and transport, waste disposal, and food storage and preparation.

156.    From the date construction commenced, the Division has also constructed and operated a number of lighting towers that are distributed throughout the Facility, including around its perimeter.

157.    The majority of these lighting towers derive their power from built-in, diesel-burning generator engines.

158.    Upon information and belief, over 100 diesel-burning lighting towers were constructed and are in use at the Everglades Detention Center.

159.    Light pollution emanating from the lighting towers at the Facility can be seen at least 15 miles, and potentially even 30 miles away, from the TNT Site. This mars what was previously an internationally renowned dark sky.

160.    The new lighting is so extensive and bright, and there are so many lighting towers on site, that the change in the historically dark preserve is readily apparent from satellite imagery.

30

161. The construction and operation of the Everglades Detention Center is impairing air quality by using diesel-burning generator sets and diesel-burning lighting towers.

162. The internal combustion engines driving the generator sets and lighting towers are subject to NSPS IIII.

163. Upon information and belief, additional equipment that emits air pollution is installed and operates at the Facility, and additional air-polluting activities are carried out. These further impair air quality.

164. There is no legal limitation on the hours of operation of any of this equipment or activity.

165. The generator sets and the lighting towers emit carbon monoxide; NOx; sulfur dioxide; fine particulate matter; particulate matter 10 microns or less in diameter; and a variety of other air pollutants.

166. Upon information and belief, and even using conservative estimates, collectively the generator sets and lighting towers have the potential to emit the following:

    a. No less than 509 tons of carbon monoxide per year;

    b. No less than 204 tons of NOx per year;

167. These conservative estimates do not include all of the air-polluting equipment and activities at the Facility.

168. The additional equipment and activities that emit air pollution that are on site likely significantly increase the source's potential to emit carbon monoxide, NOx, and other harmful air pollutants, as a reasonable opportunity for further investigation and/or discovery will likely evince.

169. Carbon monoxide adversely affects health.

170. NOx reacts with other chemicals in the air, including volatile organic compounds, to form both particulate matter and ozone. Ozone is commonly referred to as smog.

171. Ozone exposure causes aggravation of lung diseases such as asthma, emphysema, and chronic bronchitis, and can increase the frequency of asthma attacks and lung infections.

172. NOx emitted by the diesel-burning engines itself irritates airways in the respiratory system and can lead, in the short term, to respiratory symptoms (like coughing, wheezing, or difficulty breathing), hospital admissions, and visits to emergency care.

173. Longer exposures to elevated concentrations of NOx contributes to the development of asthma and potentially increases susceptibility to respiratory infections.

174. Particulate matter is a form of air pollution that consists of microscopic solids and liquids.

175. Particulate matter exposure through inhalation can impact human lungs and hearts.

176. Particulate matter exposure causes premature death; nonfatal heart attacks; aggravated asthma; decreased lung function; and increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing.

177. Each of these pollutants, independently and collectively, may also affect the air quality and visibility in Everglades National Park, a Class I area, and adversely affect other Air Quality Related Values of the area.

**The Division's "Environmental Assessment"**

178.    Around September 2025, the Division undertook the preparation of an "Environmental Assessment" to purportedly "analyze the potential environmental impacts resulting from the construction, operation, and maintenance of Everglades Detention Center."

179.    RES Florida Consulting, LLC ("RES"), a self-described environmental mitigation company, assisted the Division with preparing the Environmental Assessment.

180.    On October 24, 2025, a Senior Engineer with RES emailed "the final draft" of the Environmental Assessment, dated October 23, 2025, to several Division staff members.

181.    The Environmental Assessment names the "State of Florida Division of Emergency Management" as the "Project Sponsor."

182.    The Environmental Assessment represents that "[i]t is anticipated that the facility will be operational for approximately three years."

183.    The Environmental Assessment states that the Everglades Detention Center requires a PSD permit for carbon monoxide and NOx.

184.    The Environmental Assessment contains descriptions and analyses of the air-polluting equipment at the Everglades Detention Center and its impacts to air quality.

185.    Specifically, the Environmental Assessment provides that "air pollution emissions would be generated by . . . continuously running the 200 + generators that provide power to the facility."

186.    The Environmental Assessment includes a photograph of several large diesel-burning generator sets with the caption "Typical on-site generators."

187.    Further, the Environmental Assessment states:

a. "Additionally, this facility may also be considered a major source pursuant to Prevention of Significant Deterioration (PSD) regulations since the estimated potential-to-emit for CO and NOx exceed a minimum threshold of 250 tons per year."

b. "[N]umerous generators are in operation to power the facility, including numerous portable lights."

c. "Electric power for the facility is provided by onsite generators. In total, 200 diesel-powered units are in operation, consuming an estimated 7,615,243 gallons of diesel fuel annually."

d. "A best available control technology (BACT) analysis is required as set forth in Section 165(a)(4) of the Clean Air Act [(42 U.S.C. § 7475(a)(4))] when a facility is considered a PSD major source. Additionally, an air quality analysis is required to demonstrate that a PSD major source will not cause violations of any applicable National Ambient Air Quality Standards and adverse impacts to ambient air quality in designated Class I area (Everglades National Park). The air quality analysis includes detailed air dispersion modeling."

e. Finally, "[t]he facility is considered a major source for air permitting purposes since the estimated potential-to-emit for [carbon monoxide], NOx, PM-10 [(particulate matter 10 microns or less in diameter)], and PM-2.5 [(fine particulate matter)] exceed the minimum thresholds associated with a Title V major source of 100 tons per year."

34

188.     The Environmental Assessment also states that, beyond the discussion of air quality impacts contained therein, "[a]dditional assessment would be required to evaluate the nature of these impacts."

189.     The Environmental Assessment does not claim to satisfy any of the air quality analyses requirements PSD permitting entails.

## The Everglades Detention Center does not have a PSD Permit

190.     Neither the Division nor any other person or entity has sought or obtained any Clean Air Act permit for the Everglades Detention Center, including a PSD permit.

191.     The Everglades Detention Center is a major emitting facility and major stationary source of air pollution because it has the potential to emit no less than 509 tons of carbon monoxide per year.

192.     The Everglades Detention Center is subject to further PSD permitting requirements because it emits no less than 204 tons of NOx per year, which is a significant amount of NOx for PSD permitting purposes, and therefore a significant amount of ozone and fine particulate matter.

193.     The Division did not apply for a PSD permit pursuant to the Clean Air Act prior to constructing and beginning to operate the generator sets, lighting towers, and additional air-polluting equipment at the Everglades Detention Center.

194.     The Division has not applied for a PSD permit, or any other Clean Air Act permit, or conducted any required analyses, since commencing construction.

195.     The Division has not undertaken any Class I area analysis required by the PSD program, despite the Everglades Detention Center's proximity to Everglades National Park.

196.    If required to obtain a PSD permit, the Division will be required to conduct air quality analyses to determine the effects of air pollution emitted by the Everglades Detention Center on air quality and the NAAQS.

197.    If applied to the generator sets, lighting towers, and additional air-polluting equipment at the Everglades Detention Center, BACT will reduce air pollution emitted by the Facility.

198.    If the Division is required to apply for a PSD permit, the public will be given information about the effects of air pollution emitted by the Everglades Detention Center on air quality and the NAAQS, including the effects on Everglades National Park as a Class I area.

## CLAIM FOR RELIEF

### (42 U.S.C. § 7604(a)(3))

199.    The preceding paragraphs are realleged and incorporated herein by reference.

200.    Under the Clean Air Act, no major stationary source of air pollutants or major emitting facility may be constructed before obtaining a PSD permit. 42 U.S.C. §§ 7475(a)(1), 7604(a)(3).

201.    Obtaining a PSD permit requires, among other obligations, making showings of how the source will contribute to air pollution and affect air quality in the area of the source, and using pollution controls (BACT). 42 U.S.C. § 7475(a)(2)–(7), (d).

202.    The Everglades Detention Center is a stationary source.

203.    The Everglades Detention Center hosts a fleet of generator sets, a number of lighting towers with built-in generator engines, and, upon information and belief, other air-polluting equipment and activities.

36

204. The Everglades Detention Center is a major emitting facility and a major source of air pollutants because it has the potential to emit no less than 509 tons of carbon monoxide per year.

205. The Everglades Detention Center has the potential to emit no less than 204 tons of NOx per year, which is significant, as that term is defined in PSD permitting.

206. A source with the potential to emit a significant amount of NOx is a source that is also significant for ozone.

207. A source with the potential to emit a significant amount of NOx is a source that is also significant for fine particulate matter.

208. Thus, the Everglades Detention Center is significant for NOx, ozone, and fine particulate matter. Yet, the Division failed, and continues to fail, to comply with the PSD requirements for significant sources of NOx, ozone, and fine particulate matter.

209. The Everglades Detention Center may be a major source of NOx, as its potential to emit NOx may be greater than 250 tons per year.

210. The Everglades Detention Center may also be a major source of other regulated pollutants.

211. The Division constructs and operates the Everglades Detention Center.

212. The Division did not obtain a PSD permit for the Facility. The Division has not applied for a PSD permit.

213. The Division did not undertake, and has not undertaken, the requisite air quality analyses, public notification or participation processes, Class I air quality analysis, or BACT determination for the Facility.

214.    The Division has not publicly conceded that the Everglades Detention Center is a major emitting facility or major stationary source.

215.    The Division's construction and operation of the Everglades Detention Center, a major emitting source, without a PSD permit violated and continues to violate the PSD provisions and permitting requirements of the Clean Air Act. 42 U.S.C. § 7475(a), (d), (e).

216.    Each day of construction and failing to have a PSD permit is a separate day of violation.

217.    Upon information and belief, construction activities for the air-polluting equipment at the Everglades Detention Center are ongoing.

218.    Unless restrained by an order of this Court, these violations of the Clean Air Act will continue.

219.    As provided in Section 113(b) of the Clean Air Act, the Division is subject to civil penalties of up to $124,426 per day of violation. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Center for Biological Diversity respectfully requests that the Court:

a)    declare that Defendant has violated the Clean Air Act;

b)    permanently enjoin Defendant from constructing and operating air-pollution-emitting equipment at the Everglades Detention Center, unless and until Defendant complies with the Clean Air Act by obtaining a Prevention of Significant Deterioration permit;

c)    order Defendant to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged above;

d)    assess a civil penalty against Defendant of up to $124,426 per day per violation;

e)      award Plaintiff its costs of litigation, including reasonable attorneys' fees, costs, and expert fees and expenses, as provided by 42 U.S.C. § 7604(d); and,

f)      grant such other relief as the Court deems just and proper.

Dated:   May 27, 2026

Respectfully submitted,

s/ Elise Pautler Bennett

Elise Pautler Bennett (Fla. Bar No. 106573)
Attorney E-mail address: ebennett@biologicaldiversity.org
Center for Biological Diversity
Post Office Box 2155
St. Petersburg, FL 33731
Telephone: (727) 755-6950

Ryan Maher (DC Bar No. 1620024)
(*Pro hac vice forthcoming*)
Attorney E-mail address: rmaher@biologicaldiversity.org
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
Telephone: (781) 325-6303

Robert Ukeiley (Colo. Bar No. 45047)
(*Pro hac vice forthcoming*)
Attorney E-mail address: rukeiley@igc.org
Law Office of Robert Ukeiley
255 Mountain Meadows Road
Boulder, CO 80302
Telephone: (720) 496-8568

Benjamin Rankin (Cal. Bar No. CA00215)
(*Pro hac vice forthcoming*)
Attorney E-mail address: brankin@biologicaldiversity.org
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
Telephone: (417) 773-4655

Samuel Schneider (Colo. Bar No. 60927)
(*Pro hac vice forthcoming*)
Attorney E-mail address: sam@metamorphiclaw.com

39

Metamorphic Law
3900 E Mexico Avenue, Suite 300
Denver, CO 80210
Telephone: (720) 443-5709


*Counsel for Plaintiff Center for Biological Diversity*